[No. 25949. Department Two. April 21, 1936.]

LESTER FRIEND *et al., Appellants,* v. CONTINENTAL COAL
COMPANY *et al., Respondents.*[1]

*Fred J. Cunningham* and *T. T. Grant,* for appellants.

*Charles P. Lund* and *T. B. Southard,* for respondents.

BEALS, J.—The parties to this action own different tracts of land in Grant county riparian to Crab creek, a small stream which flows westerly and northwesterly

[1]Reported in 56 P. (2d) 1000.

through Crab creek valley. Plaintiffs own nearly two hundred acres lying to the east of the town of Wilson Creek. Defendant Continental Coal Company owns two hundred seventy acres lying to the west of plaintiffs' land, defendants Allen having occupied the farm as tenants since 1927. Defendants Graham own a tract two hundred acres in extent lying further to the west, which property they purchased from Dipper Stock Company in 1933. For some time prior to buying the land, Mr. Graham had been managing the farm for the Dipper Stock Company.

Prior to 1908, almost one hundred twenty acres of plaintiffs' land formed a portion of the bed of what was then known as Crab lake, a portion of the channel of the creek about six miles long, where, due to the terrain, the water of the creek spread over a considerable area of lateral territory. Crab lake was largely a tulle swamp and was too wet for cultivation.

At the time last referred to, the owner of the Continental Coal Company property maintained a dam in Crab creek a little to the west of the town of Wilson Creek, and irrigated a portion of the farm by means of a diversion ditch through which the water ran by gravity. The then owner of the land now owned by Mr. Graham had also dammed Crab creek and irrigated some of his land by water therefrom.

During the year 1908, the owners of the farms referred to and the owners of other property adjacent to Crab creek and lake, by agreement among themselves, improved the drainage of the creek by deepening and improving the channel through Crab lake and elsewhere. After the completion of this improvement, a new dam was constructed and used for the benefit of defendants' property for the irrigation of their lands as theretofore. The excavation of the new channel resulted in the drainage of Crab lake, and the entire lake

bed, with the exception of the creek itself, was rendered tillable and has since been cultivated.

In 1920, the Dipper Stock Company agreed with the then owner of the Continental Coal Company property that the two farms would alternate in the use of the waters of Crab creek for the purpose of irrigation, each farm to have the use of the water for alternate periods during the irrigation season.

Up to 1923, the lands now owned by plaintiffs, which had formed a portion of the bed of Crab lake, were farmed, but considerable trouble was experienced because of the flooding of these lands, which was occasioned by the maintenance of the dam on the Continental Coal Company's property. The Dipper Stock Company land was low enough to be subject to irrigation without impounding the water at a level high enough to flood the plaintiffs' property. During the year 1923, the lands now owned by plaintiffs were owned by a corporation which was in the hands of a receiver.

J. P. Lich and wife owned the Continental Coal Company land, and agreed with one E. R. Ennis, who was receiver of the corporation owning the farm now owned by plaintiffs, concerning the control and use of the waters of Crab creek by the respective parties. After naming the parties and describing the lands, the agreement, which was between Mr. Ennis as receiver, as first party, a mortgagee, with whose interest we are not concerned, as second party, and J. P. Lich and wife, as third parties, continued:

"WHEREAS, the superior court of the state of Washington, in and for Spokane county has made and entered an order authorizing said first party as such receiver, to enter into this agreement, and,

"WHEREAS, said third parties have superior rights to the use of the waters of Crab creek, for irrigation purposes, and they and their predecessors in interest

have heretofore irrigated said land by means of a dam and headgates in said creek, whereby the level of the water in said creek is raised so as to permit said waters to pass through ditches through and upon said lands, and,

"WHEREAS, when the waters of said creek are so raised to reach the highest point on the land of third parties, the same back upon and overflow a portion of the lands of first party, above referred to, so that the same cannot be properly cultivated and farmed, and,

"WHEREAS, said parties desire to avoid said conditions and to provide third parties means to irrigate their lands aforesaid without damage to said lands, in which first and second parties are interested,

"Now, THEREFORE, in consideration of the sum of One dollar and other valuable considerations, and the mutual benefits to be derived therefrom, IT IS AGREED AS FOLLOWS:

"(1) That said third parties have the superior and unquestioned right to the use of the waters of Crab creek, on said lands aforesaid, and to the free use thereof in irrigating said lands, as aforesaid, and said rights are not in any way waived, modified, or surrendered.

"(2) That said first party will cause to be built a substantial electric line, in a manner approved by third parties, to a point at or near the present headgate in said creek, and will purchase and install a Four Inch Centrifugal Pump, and a 5 H. P. electric motor, and transfer the title to same to third parties, without cost, to be used by them in pumping water to and upon said lands heretofore irrigated and such other lands as it may be desirable to irrigate, not exceeding fifty acres. And will keep up and maintain the same and provide and pay all charges for electrical energy used in the operation thereof, and will pay all expense for the upkeep of said plant and all taxes or other charges in connection therewith.

"(3) Said first party will also, at its own cost and expense, build a suitable structure to enclose and protect said pump and motor with means to keep the same locked, and third parties agree to keep the same locked when not in use.

"In the event said plant shall, for any reason, be abandoned the title to said motor and pump shall revert to and become the property of first party.

"(4)   So long as first party, his successors, or assigns, shall faithfully keep and perform the foregoing conditions, said third parties agree that they will not raise the waters of said creek so as to overflow the land of second party and that said waters will be kept at a sufficiently low level as to permit the cultivation and farming thereof.

"(5)   This agreement shall in no way alter or affect, and shall be subject to a certain agreement dated November 13, 1920, and signed and acknowledged November 15th, 1920, between the Dipper Stock Company, and the Grantors of third parties, touching the rights of said parties to the use of the waters of Crab creek, and shall not have the effect to lessen or change any rights of third parties to the use of the waters of said Crab creek whatsoever, except as above stated.

"It is further agreed that if said pump and water shall prove insufficient to irrigate said land properly and within the time stated in the Dipper Stock agreement referred to, first party agrees to immediately furnish, under like conditions, a plant of sufficient capacity to properly irrigate said lands.

"This agreement shall continue in force and be binding upon the heirs, successors, representatives and assigns of said parties, so long as said first party, his successors or assigns, shall fully perform all of its terms and conditions and on failure so to do shall immediately become null and void and of no further force and effect."

Thereafter, Mr. Ennis, pursuant to the agreement, installed a motor and pump, as he had agreed to do, the capacity thereof having later been approximately doubled at plaintiffs' expense, the first pump being insufficient to satisfy Mr. Lich. Plaintiffs each year have paid the cost of maintaining and operating the pumping system in accordance with the agreement, no request having been made for any increase in the power or capacity thereof.

Between 1923 and 1930, plaintiffs' land was farmed successfully and without much interference from flood water. During the year last mentioned, the land was damaged by floods because of the height to which the water was held by the dam on the Continental Coal Company's property, then and ever since farmed by defendant Ben Allen, as tenant. It is not contended that, with the exception of the year 1932, the operation of the irrigation system on the land owned by defendants Graham interfered with plaintiffs' farming operations, which were, however, interfered with during the year 1932 because of some changes which were then made in the diversion ditch on the Graham property.

Plaintiffs instituted this action for the purpose of recovering damages on account of the flooding of their lands, caused, as they allege, by the defendants wrongfully maintaining the dam in the main channel of Crab creek at an elevation so high as to cause flooding of plaintiffs' property during the crop season, an injunction being also asked for. Plaintiffs pleaded the agreement above referred to and alleged a violation thereof by defendants. Defendants denied any wrongdoing on their part and prayed for dismissal of the action. Trial on the merits resulted in a decree in plaintiffs' favor for nominal damages against the defendant Dipper Stock Company, the court then enjoining plaintiffs from interfering with the dams in Crab creek maintained by defendants, and denying plaintiffs any equitable or further relief. From this judgment, plaintiffs have appealed.

It is the contention of respondents that they have the right to impound the water of Crab creek by their dam to such an elevation that it necessarily, at times, floods a portion of appellants' land, they arguing that they may hold the water at an elevation sufficient to irrigate a considerable portion of their lands by grav-

ity, and that such right is superior to that of appellants. Respondents contended below, and the trial court found, that, if the agreement between Ennis as receiver and Mr. Lich will reasonably bear any construction other than as stated, the agreement does not speak the true purpose and intent of the parties, and in that event it should be held that there was a mutual mistake in reducing the agreement to writing, and that respondent Continental Coal Company is entitled to have the agreement reformed.

Appellants argue that, under the agreement above quoted, and particularly paragraph 4, respondents have no right to raise the waters of Crab creek so as to overflow appellants' property, it apparently being admitted that appellants have constructed and maintained the pump which they agreed to place in operation.

The trial court also found that:

"The lands owned by the plaintiffs, formerly the bed of Crab lake, is composed of muck and decayed vegetation, and by reason of drainage and exposure by cultivation have gradually settled so that the level of said lands is now much lower than at the time of entering into said agreement, and by reason thereof the holding of the water in the irrigation works of the defendants at the level at which it was then intended and agreed, now raises the water so as to overflow a portion of the lands of the plaintiffs."

Appellants assign error upon the admission by the court, over their objection, of evidence tending to prove that, since 1908, their property has settled, and also upon the admission, over their objection, of evidence which they contend tends to vary the terms of the written agreement of May, 1923, above quoted. Appellants also assign error upon the making of several findings of fact, upon certain conclusions of law, and upon the entry of the decree denying appellants

any relief save the award of damages against Dipper Stock Company, and enjoining them from interfering with the dam. Appellants do not contend that the award of damages is too small, the questions to be determined upon this appeal affecting the right of respondents Continental Coal Company and Allen to maintain their dam at such a height as to flood appellants' land.

If the improvement of the channel of Crab creek and the consequent draining of Crab lake resulted in any subsidence of appellants' land, it is reasonable to suppose that such subsidence commenced soon after the making of the improvement. Of course, the floor of the valley in which all of the lands in question are situated is flooded at times during the rainy season, and the former bed of Crab lake is doubtless moist during most of the months of the year. The record contains evidence to the effect that the water table is still not far below the surface. When the parties entered into the agreement of May, 1923, it must be held that they had in contemplation the then level of the lands owned by the respective parties and the situation as it then existed.

The evidence as to any subsidence of appellants' land since 1923 is of the vaguest and most unsatisfactory character. One witness on behalf of respondents testified that he had made some surveys and established levels on several occasions prior to 1908, again in 1916, and the last time in 1933. He estimated that some of appellants' land had subsided at the rate of an inch a year, but we find no basis in the evidence for holding that any such change in the level of any portion of the floor of the valley has occurred. On the other hand, another of respondents' witnesses testified that he had had charge of the irrigation of the Continental Coal Company's land from 1923 to 1932, and

that the raising of the dam's headgate to a given height had about the same effect in flooding appellants' lands at all times since 1923. An engineer, testifying for appellants, stated that he had surveyed the lands in 1929, taking approximately two hundred elevations, and that he found no subsidence between 1929 and 1934.

Examination of the record convinces us that consideration of all of the evidence on this phase of the case requires us to hold that it preponderates against the court's finding above quoted.

As we view the case, the questions to be determined are controlled by paragraph 4 of the 1923 agreement, *supra*. In their answer, respondents Continental Coal Company and Allen, *inter alia*, alleged by way of an affirmative defense that it was not intended by the 1923 agreement to interfere with the right of the owners of their property to dam the waters of the creek to a height sufficient to irrigate much of their land by gravity, as it had been irrigated for upwards of thirty years, and that, if the agreement was subject to any other construction, the contract embodied language used by mutual mistake and should be reformed. These respondents also pleaded the 1920 agreement between their predecessors in interest and Dipper Stock Company, alleging that the 1923 agreement was, by its terms, as above stated, subject to the prior agreement.

As we view this controversy, it turns, first, upon the construction of the contract of 1923, and particularly paragraph 4 thereof; and second, upon whether or not it should be held that this paragraph, or the contract, did not embody the true meaning of the parties and should be reformed in accordance with respondents' contention.

The parties differ radically as to the proper construc-

tion to be placed upon that portion of the 1923 contract whereby appellants' predecessor in interest agreed to install and maintain a pump, to transfer the title thereto to respondents, and to keep and maintain the pump in operation to be used by respondents

" . . . in pumping water to and upon said lands heretofore irrigated and such other lands as it may be desirable to irrigate, not exceeding fifty acres."

Respondents argue that the last clause, "not exceeding fifty acres," is a limitation covering the entire amount of land to be served by the pumping system, while appellants contend that it applies only to "such other lands as it may be desirable to irrigate." Appellants admit that, under the contract, they are obligated to install a pumping plant of sufficient power and capacity to furnish water for the irrigation of such of respondents' lands as were irrigated by gravity prior to the 1923 agreement and such additional land, not to exceed fifty acres, as cannot be irrigated by gravity, if the dam is maintained only at such a height as not to cause the overflow of appellants' lands.

We cannot find that the 1920 agreement has any particular bearing upon the phases of the 1923 agreement which must here be considered. The superior rights of respondents were expressly recognized in the latter contract and are not questioned. Whether the water to be placed in the ditch which serves the Dipper Stock Company property is introduced into the ditch by gravity flow or a pump, is not material, provided that the supply is steady and sufficient.

Paragraph 4 of the 1923 agreement contains the obligations of the contract which were for the benefit of appellants, in consideration of which they, in the remaining portion of the contract, bound themselves to do certain things for the benefit of respondents. Paragraph 4 states in plain and simple language that re-

spondents will not raise the waters of the creek so as to overflow appellants' land. The proposition is twice stated—first, to prohibit overflow; second, to permit the cultivation and farming of the property. We find nothing even approaching ambiguity in the language of this paragraph, and if it does not mean just what it says, it is difficult to understand what advantage appellants obtained in consideration for their agreement to install and maintain, not only the pump which they have installed, but any other pump necessary to furnish the quantity of water required to irrigate respondents' lands over and above that which the ordinary gravity flow will supply.

Respondents correctly argue that the contract must be interpreted after an examination of all the provisions thereof, with due consideration to the physical facts. In the light of these principles, we hold that, by the contract, the then owners of the Continental Coal Company property agreed that they would not maintain their dam at such a height as to raise the waters of Crab creek so as to overflow the land now owned by appellants or to interfere with the cultivation and farming thereof.

The trial court found that it was not the purpose of the 1923 contract to bind Mr. and Mrs. Lich, as we find they did bind themselves, by the agreements expressed in the contract; and that, if the contract is to be so construed, it does not speak the true purpose and intent of the parties thereto, that there was a mutual mistake made in reducing the agreement to writing, and that the contract should be reformed.

Assuming that the law in connection with this phase of the controversy is correctly embodied in the authorities cited by respondents, and that a court of equity may inquire into the physical facts and the intention of the parties, we do not find that the authori-

ties cited by respondent support its contention that this particular contract should be reformed. The burden rests upon respondents to show by clear, cogent and convincing evidence that a mistake was made by both parties in the drafting of the agreement. *Hapeman v. McNeal,* 48 Wash. 527, 93 Pac. 1076; *Bruce v. Grays Harbor Drug Co.,* 68 Wash. 668, 123 Pac. 1075; *Moore v. Parker,* 83 Wash. 399, 145 Pac. 440; *Strutzel v. Richardson,* 136 Wash. 485, 240 Pac. 682; *Blass v. Waldrip,* 176 Wash. 324, 29 P. (2d) 403.

The rule is well stated in 2 Pomeroy's Equity Jurisprudence (4th ed.) § 859, as follows:

"Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a *mere* preponderance of evidence, but only upon a certainty of the error."

It clearly appears that considerable time was taken in the discussion of the terms to be embodied in the 1923 agreement, and it is inconceivable that it was hurriedly or ill-advisedly executed.

We hold that the trial court erred in its findings of fact and conclusions of law in connection with the matters discussed in this opinion and in decreeing that, after the making of the 1923 agreement, the owners of the Continental Coal Company farm had the right to raise the waters of Crab creek to such a height as to flood appellants' property, and that the agreement of 1923 should be reformed.

Respondents, of course, have the first and superior right to the use of the waters of Crab creek and may maintain their dam at any desired height, provided that it does not cause appellants' land to be flooded.

Some other questions are presented which should properly be considered by the trial court upon further consideration of the action.

The decree appealed from is reversed, with instruc-

114

tions to the trial court to proceed in accordance with this opinion.

MILLARD, C. J., BLAKE, and MAIN, JJ., concur.

HOLCOMB, J., concurs in the result.